UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
------------------------------------------------------

| | |
|---|---|
| ONPOINT PROPERTY TECHN, INC., : | |
| : | Case No. 1:20-cv-815 |
| Plaintiff, : | |
| : | |
| vs. : | OPINION & ORDER |
| : | [Resolving Docs. 27, 28, & 39] |
| GREGORY BABBITT, *et al.*, : | |
| : | |
| Defendants. : | |

------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

In this breach of contract case, Plaintiff OnPoint Property Tech, Inc. agreed to purchase a network of real estate management entities from Defendants Gregory and Catherine Babbitt for $2,500,000.[1] The purchase agreement allowed purchasing Plaintiff OnPoint to withhold $250,000 of the purchase price to satisfy any claims that might arise against Defendants under the agreement. The agreement said the withheld $250,000 would be paid back over 18 months if no such claim arose.[2]

Plaintiff was also allowed to withhold an additional $175,000 of the purchase price to be returned once Defendants provided adequate documentation that Plaintiff would not have any successor transaction tax liability.[3]

After the deal closed, Plaintiff OnPoint says it discovered that Defendants made several material factual misrepresentations about the managed properties.[4] Plaintiff also

---

[1] Doc. 11-1 at 10.
[2] *Id.* at 11.
[3] *Id.* at 11, 37.
[4] Doc. 27-7 at 3.

Case No. 1:20-cv-815
Gwin, J.

incurred attorney's fees in an Ohio Real Estate Commission audit shortly after closing.[5] The Ohio Real Estate Commission audit centered on transactions during Defendants' ownership.

Believing that these events supported a claim under the agreement, Plaintiff withheld the $250,000 holdback and $175,000 tax holdback amounts and sued Defendants for indemnity, breach of contract, unjust enrichment, fraudulent concealment, and conversion.[6] Defendants counterclaimed for return of the withheld $425,000.[7]

The parties have each moved for partial summary judgment. Plaintiff argues that it is entitled to summary judgment on Defendants' breach of contract claim because Defendants falsified the list of managed properties provided under the agreement.[8]

Defendants likewise move for summary judgment on Plaintiff's breach of contract and fraudulent concealment claims. In support of their argument for partial summary judgment, Defendants argue that they made no material misrepresentations and at any rate expressly disclaimed any managed property warranties.[9] Defendants further argue that the agreement does not require them to indemnify Plaintiff for a post-closing audit. Finally, Defendants argue that Plaintiff's unjust enrichment claim is inappropriate because a contract governs the relationship between them.[10]

The parties have waived their jury trial rights,[11] and the case is currently set for a February 15, 2021 bench trial.[12]

---

[5] Doc. 31-6 at 3–4.
[6] Doc. 11.
[7] Doc. 6.
[8] Doc. 27.
[9] Doc. 28.
[10] *Id.*
[11] Doc. 11-1 at 46.
[12] Doc. 16.

-2-

Case No. 1:20-cv-815
Gwin, J.

For the reasons stated below, the Court **GRANTS** Defendants summary judgment on the Ohio Real Estate Commission audit indemnity claim and **DENIES** the parties' summary judgment motions regarding all other claims.

Defendants also move to strike portions of Plaintiff's reply in support of summary judgment because the reply offers evidence of a recorded telephone conversation that Plaintiff did not properly authenticate or offer in its initial summary judgment motion.[13] Because the Court does not rely on this information in resolving the parties' summary judgment motions, the motion to strike is **DISMISSED AS MOOT**.

## I.  BACKGROUND

On October 15, 2019, Plaintiff OnPoint contracted to purchase a network of real estate management businesses from Defendants for $2,500,000.[14] The parties' deal closed on December 9, 2019.[15]

As part of the agreement, Plaintiff OnPoint agreed to purchase, among other things, substantially all of Defendants' property management contracts, referred to in the agreement as "assigned contracts."[16] Schedule 1.01(c) of the agreement listed each of Defendants' approximately 1,100 assigned contracts covering approximately 1,300 rental properties in multiple states.[17]

Recognizing the inherent risk that the subject businesses might grow or shrink in the three months between the execution of the sales agreement and the closing dates, the parties

---

[13] Doc. 39.
[14] Doc. 11-1 at 10.
[15] Doc. 11 at 6.
[16] Doc. 11-1 at 7.
[17] Doc. 27-6 at 7.  The parties have not indicated whether they agree on these numbers.

-3-

Case No. 1:20-cv-815
Gwin, J.

agreed that a pre-closing 20% upward or downward variance in the number of Defendants' assigned contracts would trigger purchase price renegotiation.[18] Defendants did not otherwise "warranty or guarantee, in any way or manner whatsoever, the duration of, or renewal of the Assigned Contracts beyond the Execution date."[19]

To keep Plaintiff abreast of the businesses' condition between execution and closing, Defendants agreed to regularly update Schedule 3.20 of the agreement. Schedule 3.20 set forth all properties Defendants managed.[20] This managed-properties figure closely tracked but was not identical to the number of assigned contracts under the agreement. And these updates fell under the general agreement provision that "the representations and warranties of Seller contained in this agreement, the other Transaction Documents and *any certificate or other writing delivered pursuant to this agreement* shall be true and correct in all respects."[21]

Under agreement section 5.02, Defendants gave Plaintiff access to Defendants' property management software and financial records.[22] The parties, however, dispute the extent to which Plaintiff could access all important managed property data.[23] Nevertheless, section 5.02 likewise provided that "no investigation by Buyer or other information received by Buyer shall operate as a waiver or otherwise affect any representation, warranty, or agreement given or made by Seller."[24]

---

[18] Doc. 11-1 at 20.
[19] *Id.*
[20] Doc. 27-6 at 2–3.
[21] Doc. 11-1 at 13 (emphasis added).
[22] *Id.* at 31-32.
[23] Doc. 31 at 10.
[24] Doc. 11-1 at 32.

-4-

Case No. 1:20-cv-815
Gwin, J.

Plaintiff OnPoint, as the buyer, was responsible for paying $2,075,000 at closing.[25] As for the remaining $425,000 of the purchase price, Plaintiff was allowed to withhold $175,000 covering any Plaintiff successor tax liability as well as an additional $250,000 that Plaintiff could withhold for up to 18 months post-execution date "to satisfy any and all claims made by Buyer or any other Buyer Indemnitee against Seller pursuant to Article VI" of the agreement.[26]

Article VI in turn provided that:

Seller . . . shall pay and reimburse [buyer] for any and all Lossess incurred or sustained by [Buyer] arising out of . . .

(a) any inaccuracy in or breach of any of the representations or warranties of Seller . . . contained in this Agreement, the other Transaction Documents, or in any certification or instrument delivered by or on behalf of Seller or Shareholders pursuant to this Agreement, as of the date such representation or warranty was made or as if such representation or warranty was made on and as of the Closing Date . . .

[or]

(e) any Third Party Claim based upon, resulting from or arising out of the business, operations, properties, assets or obligations of Seller or any of its Affiliates conducted, existing or arising on or prior to the Closing Date.[27]

The agreement defined "Loss" rather broadly to include "losses, damages, liabilities, deficiencies, Actions, judgments, interest, awards, penalties, fines, diminution of values, costs or expenses of whatever kind, including reasonable attorneys' fees, investigation and settlement and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers."[28]

---

[25] *Id.* at 10–11.
[26] *Id.*
[27] *Id.* at 39–40.
[28] *Id.* at 50.

-5-

Case No. 1:20-cv-815
Gwin, J.

Between the execution and closing dates, the Babbitt Defendants provided bi-weekly managed property updates as agreed.[29] The parties' accounts differ, but during that time, Defendants represented that the number of managed properties and assigned contracts decreased less than 20% after the October 15, 2019 execution date and before the closing date.[30] On December 9, 2019, based on Defendants' representations, the $2,500,000 purchase price was left unchanged, and the closing proceeded as planned.[31]

On December 16, 2020, just a week after closing, Plaintiff was audited by the Ohio Real Estate Commission related to alleged misconduct during the time Defendants operated the business.[32] An administrative complaint was eventually lodged against Plaintiff.[33] Although the Commission issued no adverse findings, Plaintiff OnPoint incurred $22,619.28 in attorney's fees dealing with the audit.[34]

In the months after the closing, Plaintiff OnPoint claims it discovered Defendants did not actually manage at least 185 of the properties identified in the last bi-weekly Schedule 3.20 update.[35] Plaintiff says that this was a misrepresentation that substantially decreased the acquired businesses' value. Plaintiff believes it is entitled to recover for this loss under Article VI of the agreement. Plaintiff accordingly withheld the entire $250,000 holdback amount, $200,000 of which would otherwise be due to Defendants as of January 15, 2021.[36]

---

[29] Doc. 27-6 at 2–3
[30] *Id.* at 78.
[31] Doc. 11 at 6.
[32] Doc. 31-6 at 3–4.
[33] Doc. 31-5 at 3–4
[34] *Id.*
[35] Doc. 27-7 at 8-13.
[36] Doc. 11-1 at 11.

-6-

Case No. 1:20-cv-815
Gwin, J.

The final $50,000 is due April 15, 2021, 18 months after the October 15, 2019 execution date.[37] Plaintiff also withheld the $175,000 tax holdback.

On April 15, 2020, believing that Defendants intentionally misrepresented the number of properties their businesses managed and caused Plaintiff loss through the Ohio Real Estate Commission audit, Plaintiff sued Defendants, alleging indemnity, breach of contract, fraudulent concealment, unjust enrichment, and conversion claims.[38] Defendants answered, claiming that they had not breached the agreement and filed a counterclaim for payment of the $425,000 holdback amounts withheld by Plaintiff.[39]

On November 23, 2020, Plaintiff OnPoint moved for partial summary judgment on its breach of contract claim, arguing that there was no dispute of material fact that Defendants breached an express warranty to truthfully and correctly list their managed properties, leading to a reduction in the deal value.[40]

Also on November 23, 2020, Defendants moved for partial summary judgment.[41] In their motion, Defendants argued that renegotiation of the contract price in the event of a 20% decrease in assigned contracts between execution and closing was the sole warranty Defendants made regarding their managed properties.[42] In effect, Defendants argued that the purchase agreement itself recognized that all assigned contracts might not follow the agreement and gave Plaintiff OnPoint a right of adjustment for losses exceeding 20% of the assigned contracts only.

---

[37] *Id.*
[38] Doc. 1.
[39] Doc. 6.
[40] Doc. 27.
[41] Doc. 28.
[42] *Id.*

Case No. 1:20-cv-815
Gwin, J.

Because the number of assigned contracts decreased at most 12%, Defendants argue, Plaintiff has no viable breach of warranty claim.[43] Defendants also claim they made no misrepresentations of material fact that Plaintiff could have detrimentally relied upon, defeating any fraudulent concealment recovery.

Further, Defendants contend that they are not required to indemnify Plaintiff for its Ohio Real Estate Commission audit attorneys' fees.[44] Finally, Defendants argue that Plaintiff's unjust enrichment claim should be dismissed because a valid contract controls the terms of the parties' transaction.[45]

Delaware law governs the parties' agreement.[46]

## II. LEGAL STANDARD

The Court grants summary judgment if the movant demonstrates that there is no genuine dispute of material fact and it is entitled to judgment as a matter of law.[47] A genuine issue of material fact exists if a reasonable jury could return a verdict for the non-moving party.[48] The Court views the evidence, and draws all reasonable inferences, in the light most favorable to the non-moving party.[49]

To establish a Delaware breach of contract claim, a plaintiff must prove: (1) a valid contract; (2) the breach of a contractual obligation; and (3) plaintiff's damages from the breach.[50]

---

[43] *Id.*
[44] *Id.*
[45] *Id.*
[46] Doc. 11-1 at 30.
[47] Fed. R. Civ. P. 56(a).
[48] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
[49] *Rhinehart v. Scutt*, 894 F.3d 721, 735 (6th Cir. 2018).
[50] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

-8-

Case No. 1:20-cv-815
Gwin, J.

Courts interpret Delaware contracts according to their plain and ordinary meaning,[51] reading individual terms not in isolation but as part of "the agreement's overall scheme."[52] To that end, Courts "give each provision and term effect, as not to render any part of the contract mere surplusage."[53]

### III.  DISCUSSION

#### A. *OnPoint's Unjust Enrichment Claim*

"When a complaint alleges an express, enforceable contract that controls the parties' relationship . . . a claim for unjust enrichment will be dismissed."[54] Here, Plaintiff OnPoint relies on the provisions of (and therefore the validity of) the purchase agreement. As Plaintiff concedes, their unjust enrichment claim should be dismissed.[55]

#### B. *OnPoint's Contract Claims*

1. Ohio Real Estate Commission Audit Indemnity Claim

Defendants argue that they are entitled to summary judgment on Plaintiff's post-closing audit indemnity claim because (1) Plaintiff was audited, not Defendants; (2) the purchase agreement does not require Defendants to reimburse or indemnify Plaintiff for an audit; (3) Plaintiff cannot demonstrate fraud surrounding the audit; and (4) Plaintiff suffered no damages."[56] Defendants also argued in their summary judgment reply that because the

---

[51] *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009).
[52] *United States v. Sanofi Aventis U.S., LLC*, 226 A.3d 1117, 1129 (Del. 2020).
[53] *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010).
[54] *Kuroda v. SPJS Holdings, LLC*, 971 A.2d 872 (Del. Ch. Ct. 2009).
[55] Doc. 31 at 11–12.
[56] Doc. 28-1 at 17–18.

-9-

Case No. 1:20-cv-815
Gwin, J.

audit began a week after closing, the audit is not a "Third Party Claim . . . conducted, existing, or arising on or prior to the Closing Date."[57]

Although Defendants did not make this final argument regarding the timeliness of the audit until their reply brief, the Court will consider it because it is based on the plain meaning of the purchase agreement, which has long been available to both parties.

The agreement allows Plaintiff OnPoint to seek indemnification for third-party claims. The agreement defines a Third Party Claim as "the assertion or commencement of any Action made or brought by any Person who is not a Party to" the agreement.[58] But those claims must be conducted, arise, or exist on or before the closing date. Here, the earliest audit inquiry began on or around December 16, 2019, about one week *after* the December 9, 2019 closing date.[59] Nothing suggests Defendants knew the audit was coming at the closing. The official administrative complaint related to the audit was filed months later on February 28, 2020.[60]

Even viewed in the light most favorable to Plaintiff OnPoint, the audit did not arise on, did not exist, and was not conducted on or before the closing date. Accordingly, Defendants are entitled to summary judgment on the audit indemnity claim.

2. Breach of Warranty Claim

Plaintiff OnPoint claims that Defendants misrepresented the number of properties they managed in the agreed-upon bi-weekly updates between the agreement execution and closing dates. Plaintiff claims that at closing, Defendants managed 185 fewer properties

---

[57] Doc. 34 at 9; Doc. 11-1 at 40.
[58] Doc 11-1 at 40.
[59] Doc. 31-5 at 12.
[60] *Id.* at 6.

-10-

Case No. 1:20-cv-815
Gwin, J.

(roughly 96 assigned contracts) than shown on the schedules provided before closing.[61] Defendants dispute this figure.[62]

The remaining issue for the Court, then, is whether a reasonable fact finder could return a breach of contract verdict for Plaintiff upon finding that the managed property figures were incorrectly reported.

Defendants argue that Plaintiff does not have a warranty claim because the parties understood that the number of assigned contracts could change before closing and the agreement's sole warranty was an automatic price renegotiation only when there had been at least a 20% pre-closing assigned contract decrease. To support their argument, Defendants cite section 3.06(d), which states that Defendants did not "warranty or guarantee, in any way or manner whatsoever, the duration of, or renewal of the Assigned Contracts beyond the Execution date" before setting forth the renegotiation clause as an exclusive remedy.[63]

However, the agreement also contained a covenant that "the representations and warranties of [Defendants] contained in this agreement, the other Transaction Documents and *any certificate or other writing delivered pursuant to this agreement* shall be true and correct in all respects."[64]

The Schedule 3.20 updates, whether required under the original contract language or not, were "writings delivered pursuant to [the] agreement." Defendants accordingly warranted the correctness and truthfulness of the managed property figures.

---

[61] Doc. 27-7 at 8–13.
[62] Doc. 28-1 at 7-8; Doc. 30-1 at 15–16.
[63] Doc. 11-1 at 20.
[64] *Id.* at 13 (emphasis added).

Case No. 1:20-cv-815
Gwin, J.

Further, it is not clear that section 3.06(d) would bar the present claim even read in isolation. The section provides that Defendants did not guarantee the "*duration of, or renewal of* the Assigned Contracts beyond the Execution date."[65] But Plaintiff does not seek to recover for contract cancellations or non-renewals between execution and closing. Rather, Plaintiff seeks to recover for Defendants' untrue and/or incorrect representations about the number of managed properties or assigned contracts under management at the time of the agreement.

Viewing all the facts in the light most favorable to Plaintiff, the Court believes that a reasonable fact finder could return a verdict for Plaintiff.

Defendants offer two additional defenses. First, they argue that even if they misrepresented the number of managed properties or assigned contracts, Plaintiff had access to all relevant financial information because Defendants gave Plaintiff pre-closing property management software and financial records access.[66]

Plaintiff disputes that point, claiming that it was unable to access much of the information it needed.[67] But even if Defendants were right that Plaintiff had access to all important documents, section 5.02 of the agreement states that "no investigation by Buyer or other information received by Buyer shall operate as a waiver or otherwise affect any representation, warranty, or agreement given or made by Seller."[68] Plaintiff's access to the property management information does not defeat Plaintiff's breach of contract claim.

---

[65] *Id.* at 20 (emphasis added).
[66] Doc. 28-1 at 16.
[67] Doc. 31 at 10.
[68] Doc. 11-1 at 32.

Case No. 1:20-cv-815
Gwin, J.

Second, Defendants argue that Plaintiff will not be able to demonstrate damages from breach because they would have been required to close on the contract for the $2,500,000 purchase price anyway.[69] That is, Plaintiff was not entitled to renegotiate the purchase price because the number of assigned contracts did not vary 20% between closing and execution.[70] Nevertheless, if Plaintiff can show significant differences between the number of managed properties from those represented at closing, Plaintiff may still have some claim that it would not have paid $2,500,000 for the business or any diminution in value caused my Defendants' misrepresentations under agreement Article VI.

Further, some management contracts seemed terminated *before the execution date* (and thus not covered by the 20% renegotiation clause) that were included in the list of managed properties at closing.[71] To prevail at trial on a breach of contract theory, Plaintiff will be required to prove damages for properties before or after the execution date by providing the date that the alleged termination took place and any resulting damages.

Alternatively, Defendants may prove at trial that they actually managed some or all of the subject properties at closing, defeating or reducing Plaintiff's recovery.

C. *OnPoint's Fraud Claim*

Plaintiff OnPoint's fraudulent concealment claim presents similar genuine material fact issues. A Delaware fraudulent concealment claim requires: (1) defendant's deliberate concealment of material fact; (2) scienter; (3) intent to induce reliance upon the concealment; (4) causation; and (5) damages resulting from the concealment.[72]

---

[69] Doc. 28-1 at 16.
[70] Doc. 11-1 at 20.
[71] *See, e.g.*, Doc. 29 at 90–92.
[72] *Nicolet Inc. v. Nutt*, 525 A.2d 146, 149 (Del. 1987).

-13-

Case No. 1:20-cv-815
Gwin, J.

Here, Plaintiff has shown genuine material fact issues regarding all five elements. The Court accepts for the sake of argument Plaintiff's evidence that 185 properties were incorrectly included on the managed properties lists both before and after the execution date. A reasonable fact finder could find that: (1) Defendants were aware that the properties lists included terminated properties; (2) that Defendants concealed the terminations to negotiate a higher purchase price and/or to ensure closing after execution; (3) that Plaintiff relied on the termination concealment; and (4) that the Plaintiff as a result overpaid for Defendants' businesses or received less value than it bargained for.

At trial, Plaintiff must take care to thoroughly distinguish between contracts terminated before and after the execution date and present the corresponding reliance, scienter, and damages theories that would allow it to recover under a fraudulent concealment theory.

### D. Defendants' Holdback Amount Counterclaim

As previously mentioned, there is a genuine issue of material fact regarding whether Defendants managed some or all of the 185 at-issue properties at closing. If this is established at trial, Plaintiff's fraudulent concealment and breach of contract claims will necessarily fail in whole or part, and Defendants will be entitled to the return of the $250,000 holdback amount, less any recovery by Plaintiff.[73]

Depending on the facts established at trial regarding Plaintiff's successor tax liability, Defendants may also be entitled to return of the $175,000 tax holdback.

---

[73] Doc. 11-1 at 11.

-14-

Case No. 1:20-cv-815
Gwin, J.

### E. CONCLUSION

For the reasons stated, the Court **GRANTS** Defendants summary judgment on the Ohio Real Estate Commission audit indemnity claim, **DENIES** the parties' summary judgment motions on all other claims, and **DISMISSES AS MOOT** Defendants' motion to strike portions of Plaintiff's reply brief.

IT IS SO ORDERED

Dated: February 4, 2021        *s/  James S. Gwin*
                    JAMES S. GWIN
                    UNITED STATES DISTRICT JUDGE