UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
--------------------------------------------------------------

ONPOINT PROPERTY TECH, INC.,          :
                                      :          Case No. 1:20-cv-815
          Plaintiff,                  :
                                      :          FINDINGS OF FACT &
                                      :          CONCLUSIONS OF LAW
                                      :          GRANTING JUDGMENT
vs.                                   :          FOR DEFENDANTS
                                      :
                                      :
GREGORY BABBITT, *et al.*,            :
                                      :
          Defendants.                 :
--------------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

Plaintiff OnPoint Property Tech, Inc. agreed to purchase a network of real estate management entities from Defendants Gregory and Catherine Babbitt for $2,500,000.[1] The subject entities managed hundreds of residential rental properties in several states.[2]

The purchase agreement allowed Plaintiff to withhold $250,000 of the purchase price to satisfy any agreement-based claims against Defendants. The purchase agreement required the $250,000 withholding to be paid back over 18 months if no such claim arose.[3]

After the deal closed, Plaintiff discovered that Defendants arguably had made material factual misrepresentations about the customer properties the purchased entities managed.[4] Believing that these events supported a claim under the agreement, Plaintiff withheld the $250,000 holdback amount.

---

[1] Doc. 64 at 7–8; Doc. 11-1 at 10.
[2] Doc. 89 at 142–46.
[3] Doc. 11-1 at 11.
[4] Doc. 89 at 64–71.

Case No. 1:20-cv-815
Gwin, J.

On April 15, 2020, Plaintiff sued Defendants for breach of contract, fraudulent concealment, and conversion.[5]  Defendants, believing that they had not breached the contract or otherwise injured Plaintiff, counterclaimed for return of the $250,000 holdback amount.[6]

On November 23, 2020, the parties each moved for partial summary judgment,[7] which this Court granted in part and denied in part on February 4, 2021.[8]  Because the parties' agreement waived their respective jury trial rights,[9] the case proceeded to a February 16, 2021 bench trial.[10]  The parties have each submitted proposed findings of fact and conclusions of law.[11]  For the reasons stated below, the Court **GRANTS** judgment for Defendants on all claims.

I.       FINDINGS OF FACT

On October 15, 2019, Plaintiff OnPoint Property Tech, Inc., contracted to purchase a network of real estate management businesses from Defendants Gregory and Catherine Babbitt for $2,500,000.[12]  The parties agreed to a December 9, 2019 closing date.[13]

---

[5] Doc. 64 at 8; Doc. 11.
[6] Doc. 6.
[7] Doc. 27; Doc. 28.
[8] Doc. 66.
[9] Doc. 11-1 at 46.
[10] Doc. 89.
[11] Doc. 90; Doc. 91.
[12] Doc. 64 at 7–8.
[13] *Id.* at 8.

Case No. 1:20-cv-815
Gwin, J.

Defendants principally operated a property management company.  In return for fees, Defendants managed advertisement, leasing, repairs, rent collection, and other property responsibilities.[14]  Most management contracts involved single or limited residential units.[15]

As part of the agreement, Plaintiff OnPoint agreed to purchase, among other things, substantially all of Defendants' property management contracts, referred to in the agreement as "assigned contracts."[16]  Schedule 1.01(c) of the agreement listed each of Defendants' approximately 1,100 assigned contracts covering 1,300 rental properties in multiple states.[17]

Recognizing the inherent risk that the number of management contracts might grow or shrink between the execution and closing dates, the parties agreed that a pre-closing 20% upward or 20% downward variance would "increase or reduce the [$2,500,000] Purchase Price accordingly."[18]  Defendants did not otherwise "warranty or guarantee, in any way or manner whatsoever, the duration of, or renewal of the Assigned Contracts beyond the Execution date."[19]

To keep Plaintiff abreast of the businesses' condition between execution and closing, the parties agreed that Defendants would regularly update Schedule 3.20 of the agreement, which set forth all properties the businesses managed.[20]  This managed-properties figure closely tracked but was not identical to the number of assigned contracts sold under the agreement.  And these updates fell under the general agreement provision that "the

---

[14] Doc. 89 at 142–43.
[15] *Id.* at 143–46.
[16] Doc. 11-1 at 7.
[17] Doc. 89 at 7–8, 188.
[18] Doc. 11-1 at 20.
[19] *Id.*
[20] *Id.* at 29.

Case No. 1:20-cv-815
Gwin, J.

representations and warranties of Seller contained in this agreement, the other Transaction Documents and any certificate or other writing delivered pursuant to this agreement shall be true and correct in all respects."[21]

In a pre-closing November 29, 2019 email to his wife and others, Defendant Gregory Babbitt expressed concern about declining numbers of managed properties and the potential for $500,000 reduction in the sale price of the businesses if the Section 3.06(d) 20% clause was triggered.[22]  In this email, Defendant Babbitt acknowledged risk of loss to the business and stated his preference that Plaintiff OnPoint, as the buyer, bear that risk.[23]

Plaintiff OnPoint was responsible for paying $2,075,000 on or before the closing.[24] As for the remaining $425,000 of the purchase price, Plaintiff was allowed to withhold $175,000 to cover potential successor tax liability as well as an additional $250,000 "to satisfy any and all claims made by Buyer or any other Buyer Indemnitee against Seller pursuant to Article VI" for up to 18 months post-execution date.[25]

Article VI in turn provided that:

Seller . . . shall pay and reimburse [Buyer] for any and all Losses incurred or sustained by [Buyer] arising out of . . .

(a) any inaccuracy in or breach of any of the representations or warranties of Seller . . . contained in this Agreement, the other Transaction Documents, or in any certification or instrument delivered by or on behalf of Seller or Shareholders pursuant to this Agreement, as of the date such representation or warranty was made or as if such representation or warranty was made on and as of the Closing Date . . .

---

[21] *Id.* at 13.
[22] Doc. 89 at 192–96.
[23] *Id.*
[24] Doc. 11-1 at 10–11.
[25] *Id.* at 11.

-4-

Case No. 1:20-cv-815
Gwin, J.

The agreement defined "Loss" rather broadly to include "losses, damages, liabilities, deficiencies, actions, judgments, interest, awards, penalties, fines, diminution of values, costs or expenses of whatever kind, including reasonable attorneys' fees, investigation and settlement and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers."[26] Crucially, however, the agreement provided that Plaintiff could receive this indemnification only for losses incurred "as a result of Seller's or Shareholders' fraud or willful misconduct."[27]

Between execution and closing, Defendants provided bi-weekly updates of the number of managed properties, as agreed.[28] During that time, the number of managed properties and assigned contracts, by all accounts, decreased—but less than 20%.[29] On December 9, 2019, the purchase price was left unchanged, and the deal closed.[30]

In the months after closing, Defendants received $3,100 after licensees of one of the sold entities erroneously paid Defendants license renewal fees after the right to payment passed to Plaintiff.[31] But, by the same token, Defendants also incurred a $6,200 loss when two rent checks bounced after Defendants had already transferred corresponding funds to Plaintiff on the assumption that the checks would clear.[32] Defendants never paid the $3,100 to, nor received $6,200 reimbursement from, Plaintiff.[33]

---

[26] *Id.* at 50.
[27] *Id.* at 40.
[28] Doc. 89 at 22.
[29] Doc. 90 at 7; Doc. 91 at 5–8.
[30] Doc. 89 at 9–10.
[31] *Id.* at 196–97.
[32] *Id.* at 167–69.
[33] *Id.* at 168, 197.

Case No. 1:20-cv-815
Gwin, J.

Plaintiff OnPoint also discovered after closing that Defendants had received termination notices for various properties listed in the last Schedule 3.20 update.[34]  Plaintiff believed Defendants had intentionally misrepresented that they were managing these properties to avoid a reduction in the $2,500,000 purchase price before closing.[35]

Arguing that this discrepancy constituted indemnifiable loss under the agreement, Plaintiff OnPoint withheld the $250,000 holdback amount, $200,000 of which would otherwise be due to Defendants as of January 15, 2021.[36]  The final $50,000 is due April 15, 2021, the 18-month anniversary of the October 15, 2019 execution date.[37]  Although Plaintiff OnPoint also originally withheld the $175,000 tax holdback, it ultimately released those funds to Defendants on August 28, 2020.[38]

The Court now takes up (1) Plaintiff OnPoint's breach of contract and fraud claims based on Defendants' alleged misrepresentations about the number of properties Defendants managed at closing, (2) Plaintiff's conversion claim for return of the $3,100 licensing fees erroneously paid to Defendants after closing, and (3) Defendants' counterclaim for return of $200,000 portion of the holdback amount now due under the agreement.

II.    CONCLUSIONS OF LAW

---

[34] *See, e.g.*, Doc. 89 at 131.
[35] Doc. 91 at 12–13.
[36] Doc. 11-1 at 11.
[37] *Id.*
[38] Doc. 64 at 8.

-6-

Case No. 1:20-cv-815
Gwin, J.

The parties' agreement is governed by Delaware law.[39]  To establish a Delaware breach of contract claim, a plaintiff must prove: (1) a valid contract; (2) the breach of a contractual obligation; and (3) plaintiff's damages from the breach.[40]

Courts interpret Delaware contracts according to their plain and ordinary meaning,[41] reading individual terms not in isolation but as part of "the agreement's overall scheme."[42] To that end, courts "give each provision and term effect, as not to render any part of the contract mere surplusage."[43]

Aside from the 20% price adjustment clause, the parties' agreement provides that Plaintiff can recover only for losses resulting from Defendants' "fraud or willful misconduct."[44]  Delaware law defines "willful misconduct" as "intentional wrongdoing, not mere negligence, gross negligence or recklessness."[45]  Similarly, a Delaware fraudulent concealment claim requires: (1) defendant's deliberate concealment of material fact; (2) scienter; (3) intent to induce reliance upon the concealment; (4) causation; and (5) damages resulting from the concealment.[46]

Finally, in Delaware, conversion is an "act of dominion wrongfully exerted over the property of another, in denial of [the plaintiff's] right, or inconsistent with it."[47]  A Delaware

---

[39] Doc. 11-1 at 30.

[40] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

[41] *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009).

[42] *United States v. Sanofi Aventis U.S., LLC*, 226 A.3d 1117, 1129 (Del. 2020).

[43] *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010).

[44] Doc. 11-1 at 40.

[45] *Dieckman v. Regency GP LP*, No. 11130, 2021 WL 537325, at *36 (Del. Ct. Ch. Feb. 15, 2021) (citing 12 Del. C. § 3301(g)).

[46] *Nicolet Inc. v. Nutt*, 525 A.2d 146, 149 (Del. 1987).

[47] *Kuroda v. SPJS Holdings, LLC*, 971 A.2d 872, 889–90 (Del. Ct. Ch. 2009) (citing *Drug, Inc. v. Hunt*, 168 A. 87, 93 (Del. 1933)).

Case No. 1:20-cv-815
Gwin, J.

conversion claim, however, cannot be brought to enforce a right to payment of money under a contract or return of money wrongfully taken.[48]

### A. *Plaintiff OnPoint's Breach of Contract and Fraud Claims*

Neither the assigned contracts nor managed properties subject to the parties' agreement declined by 20% or more between the execution and closing dates, precluding any Plaintiff recovery under Section 3.06(d).[49]  Plaintiff OnPoint therefore relies on fraud and breach of contract through misrepresentation claims.  Specifically, Plaintiff argues that Defendants misrepresented in Schedule 3.20 the number of properties they managed, resulting in a 184 managed property shortfall between reality and Plaintiff's expectations.[50]

But even if Plaintiff OnPoint could show the other elements of its claims, Plaintiff provides weak evidence of any fraud or intentional misconduct by Defendants.  At best, Plaintiff OnPoint has shown that Defendants were self-interested and anxious to get the deal done for fear of an adverse price adjustment.  But a better-you-than-me risk of loss perspective in a business transaction does not by itself prove fraud.

Further, the evidence suggests that the parties have a fair-minded disagreement about what it means to "manage" a property—specifically whether a notice of termination immediately ends the management relationship or instead merely begins the process that could eventually lead to a management termination outcome.[51]  Defendants show evidence that even after client notification of an intent to terminate a contract, Defendants would keep

---

[48] *Id.* at 890.
[49] Doc. 11-1 at 20; Doc. 90 at 7; Doc. 91 at 5–8.
[50] Doc. 91 at 9.
[51] Doc. 89 at 22–23; 159–61.

Case No. 1:20-cv-815
Gwin, J.

a client relationship until contract receipts and expenses were reconciled and a release was received.[52]

While both sides' arguments seem well grounded, in this context, Plaintiff OnPoint bears the burden to prove Defendants' "fraud or willful misconduct."[53]  The evidence Plaintiff OnPoint offered at trial did not meet this burden, defeating its breach of contract claim.

For the same reasons, Plaintiff OnPoint has not met the deliberate concealment and scienter requirements of a Delaware fraud claim.

B. *Plaintiff OnPoint's Conversion Claim.*

Plaintiff's conversion claim for the misdirected $3,100 licensing fees fails for at least two reasons.  First, a Delaware conversion claim "applies only to tangible property and not to the wrongful taking of money."[54]  Plaintiff's conversion claim is therefore inappropriate here, whether Plaintiff's right to the money is construed contractually or otherwise.

Second, even if Plaintiff OnPoint stated a valid conversion claim, Defendants had superior rights to the $3,100.  Plaintiff undisputedly owed Defendants $6,200 for the tenant checks that bounced after Plaintiff had already received corresponding funds from Defendants on the assumption the checks would clear.  Accordingly, Defendants did not act wrongfully by retaining the $3,100 in partial satisfaction of Plaintiff's debt.[55]

C. *Defendants' Holdback Amount Counterclaim*

---

[52] *Id.*
[53] Doc. 11-1 at 40.
[54] *Carlton Investments v. TLC Beatrice Intern. Holdings, Inc.*, No. 13950, 1995 WL 694397, at *16 (Del. Ct. Ch. Nov. 21, 1995).
[55] *Kuroda*, 971 A.2d at 889–90.

Case No. 1:20-cv-815
Gwin, J.

Article VI of the parties' agreement allowed Plaintiff to withhold $250,000 of the purchase price "to satisfy any and all claims made by Buyer or any other Buyer Indemnitee against Seller pursuant to Article VI," to be paid to Defendants in $50,000 increments over the 18 months following the execution date.[56]  Because Plaintiff has not prevailed in any claim against Defendants, the Court finds that Plaintiff is contractually obligated to return the $200,000 due to Defendants under the agreement, with the final $50,000 to become due on April 15, 2021.[57]

However, because the Court finds that Plaintiff had a good-faith basis for withholding the $200,000, the Court declines to impose pre-judgment interest on the amount withheld.

### III.    CONCLUSION

For the reasons stated, the Court **GRANTS** judgment for Defendants and orders Plaintiff OnPoint to return the $200,000 portion of the holdback amount currently due and, barring further good-faith claims, to make payment of the final $50,000 on or before April 15, 2021.  The Court imposes post-judgment interest to run at a rate of 5.75% per year from the date of the judgment.  Because Defendants do not argue that they are entitled to attorney fee indemnification,[58] and the Court cannot find an agreement provision indicating otherwise, each side shall bear its own attorney fees.

IT IS SO ORDERED

Dated:  March 11, 2021                           _s/      James S. Gwin_
                                                  JAMES S. GWIN
                                                  UNITED STATES DISTRICT JUDGE

---

[56] Doc. 11-1 at 11.
[57] _Id._
[58] Doc. 82 at 7; Doc. 83 at 7; Doc. 90 at 19.